AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

<table>
<tr><td>

UNITED STATES OF AMERICA,

v.

KEVIN GIL-CARRANZA and
PEDRO ROJAS-SANCHEZ,

Defendants

</td><td>

Case No.  ED20-207M

</td></tr>
</table>

**FILED**
CLERK, U.S. DISTRICT COURT

APR 3 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DTS___ DEPUTY

## <u>AMENDED</u> CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 1, 2020 in the county of Riverside in the Central District of California, the

defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Possess Methamphetamine with Intent to Distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ signed pursuant to Fed. R. Crim. P. 4.1
*Complainant's signature*

**Ubaldo Perez, Border Patrol Agent**
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    April 3, 2020

*Judge's signature*

City and state:   Riverside, California        Hon. Kenly Kiya Kato, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Ubaldo Perez, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of a criminal complaint against Kevin GIL-CARRANZA ("GIL-CARRANZA") and Pedro ROJAS-SANCHEZ ("ROJAS-SANCHEZ") (collectively with GIL-CARRANZA, "defendants") for a violation of 21 U.S.C. § 846: Conspiracy to Possess Methamphetamine with Intent to Distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii).

2.     This affidavit is also made in support of an application for a warrant to search four cellular phones, which were recovered during the arrests of GIL-CARRANZA and ROJAS-SANCHEZ, as described more fully in Attachment A, and currently maintained in custody of the United States Border Patrol in Murrieta, California:

        a.    Samsung Galaxy J7 Crown; Serial Number: R58K911WL5P ("SUBJECT DEVICE 1");

        b.    Samsung Galaxy A10E; Serial Number: RF8N307PK5N ("SUBJECT DEVICE 2");

        c.    Samsung Galaxy A10E; Serial Number: RZ8N2213KSJ ("SUBJECT DEVICE 3"); and

        d.    LG Phoenix 4; Serial Number: 910VTVR685175 ("SUBJECT DEVICE 4") (collectively as, "SUBJECT DEVICES 1-4").

3.     The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Methamphetamine), 21 U.S.C. § 846 (Conspiracy to Distribute

Methamphetamine and Possess Methamphetamine with Intent to Distribute), 21 U.S.C. § 843(b) (Unlawful Use of a Communication Facility to Commit or Facilitate Felony Drug Offense), and 18 U.S.C. § 758 (High Speed Flight from an Immigration Checkpoint), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a United States Border Patrol ("USBP") Agent with the United States Department of Homeland Security, Customs and Border Protection ("CBP").  I have been employed by CBP since July 17, 2008. I am a graduate of the Federal Law Enforcement Training Center in Artesia, New Mexico, where I received training in violations of laws relating to immigration and controlled substances as well as the preparation and execution of search and arrest warrants.  I am currently assigned to the San Diego Sector Intelligence Unit ("SIU"), as a Border Patrol Agent-Intelligence.  During the course of my employment with CBP

and with SIU, I have participated in the investigation and prosecution of alien smuggling and narcotic smuggling cases.

6.    During my employment with CBP I have participated in the surveillance of suspected narcotic traffickers, alien smugglers, and other general crimes.  Also, I have spoken with other experienced investigators concerning methods and practices of alien smugglers.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

7.    Around 11:15 p.m. on April 1, 2020, defendants arrived at an operational CBP checkpoint near Temecula, California. Once defendants exhibited some suspicious behavior, the USBP agent directed defendants to pull over into secondary inspection.  Defendants, however, drove off.  CBP agents, in a marked CBP vehicle, tried to pull the defendants over and when the driver, GIL-CARRANZA, failed to yield, agents engaged in a high-speed chase of defendants, reaching speeds as high as 130 miles per an hour on Interstate 15.  After spike strips failed to stop defendants, agents successfully executed a "pit maneuver" to stop defendants.

8.    Inside the car, agents found approximately 10.45 kilograms of methamphetamine in a trash bag, which was on the back seat floorboard, scales, and approximately 90 grams of black tar heroin in the glove compartment.  Agents also recovered SUBJECT DEVICES 1-4.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

9.    The following information was obtained through my conversations with other agents and reading their reports.

10.   On April 1, 2020, the USBP checkpoint was fully operational in a two lane configuration. The USBP checkpoint is located on the northbound lanes of Interstate 15, in Temecula, California, which is located in Riverside County and within the Central District of California.

11.   At approximately 11:15 P.M. on April 1, 2020, Agent Beatriz Ortega Tracy ("Ortega Tracy") was conducting primary inspections at the USBP checkpoint.  A white Chrysler 300 bearing Minnesota license plate number 355WGG approached Agent Ortega Tracy's position in lane two.  Agent Ortega Tracy motioned the car to stop and identified herself as a USBP Agent. Agent Ortega Tracy asked the car occupants, later identified as Kevin GIL-CARRANZA (driver) and Pedro ROJAS-SANCHEZ (passenger), where they were going.  Both GIL-CARRANZA and ROJAS-SANCHEZ were initially hesitant to answer but after a few seconds GIL-CARRANZA responded in a low voice, "Colorado."  Agent Ortega Tracy sensed that the driver and passenger were nervous.  Agent Ortega Tracy directed the driver into the secondary inspection area, but the car drove past the entrance to the area.  Agent Ortega Tracy motioned with her hands and verbally directed the car to the secondary inspection area.  The car, however, accelerated past the secondary inspection area.  The car continued on Interstate 15 and rapidly accelerated away from the USBP checkpoint in an attempt to avoid further inspection.

12.   At this time, Agent William Tracy heard Agent Ortega Tracy call out "runner from the point."  Agent William Tracy was in a marked Border Patrol vehicle and in USBP uniform.  Agent

William Tracy chased the car and caught up to it near the State Route 79/Temecula Parkway exit, which is located approximately 2 miles north of the checkpoint.  Agent William Tracy positioned his marked Border Patrol vehicle behind the car and activated his lights and sirens.  At this time the car was driving approximately 100 miles per hour.  The posted speed limit on Interstate 15 is 70 miles per hour.  The car continued to drive at a high rate of speed, upwards of 120 miles per hour.  The car failed to yield to the agent's emergency equipment for approximately 18 miles.

13.  At approximately 11:25 P.M., Agent Zachary Reid took over the pursuit and Agent Keith Miller took over secondary pursuit responsibilities.  At approximately 11:26 P.M., Agent Reid attempted to perform a "Boxing-In" technique.  Specifically, Agent Reid placed his marked Border Patrol vehicle in front of the suspect's car and slowed down, but the car was able to evade Agent Reid and drove around him.  Agent Reid attempted this technique several times.  During one of these attempts the suspect's car rammed into the back of Agent Reid's car, which caused Agent Reid to temporarily lose control of his car and move into another traffic lane.  At approximately 11:27 P.M., Agent Miller conducted a "PIT" maneuver on the suspect's car approximately 1 mile south of the Main Street exit on Interstate 15 in Riverside County, which ended the pursuit.  A PIT maneuver is a technique in which the law enforcement vehicle nudges the rear of the suspect vehicle in order to cause the suspect vehicle to destabilize and end the pursuit.

14.   Agent William Tracy extracted the driver of the car, later identified as GIL-CARRANZA, and placed him under arrest. Agent J. Slaten placed the passenger, later identified as ROJAS-SANCHEZ, under arrest.  Both defendants were arrested for violation of 18 U.S.C. § 758 (High Speed Flight from Immigration Checkpoint).

15.   Agent Yamul Ramirez arrived at the vehicle stop with his canine partner BAS (ID#150279) and conducted an exterior sniff of the suspect's Chrysler 300.  The exterior sniff yielded an alert to the rear passenger compartment.  BAS and Agent Ramirez are a trained and certified team in the detection of concealed humans, the odors of marijuana, methamphetamine, cocaine, heroin, and ecstasy.

16.   Agent Ramirez advised Agent Juan Gonzalez that his canine partner alerted to the car.  Agent Gonzalez conducted a hand search of the vehicle and found two black trash bags on the rear passenger floor.  Agent Gonzalez opened both bags and found two large bundles of a crystalline substance wrapped in food saver bags, consistent with the appearance of methamphetamine and three cellular phones (SUBJECT DEVICE 1, SUBJECT DEVICE 2, and SUBJECT DEVICE 3,) inside the front passenger side of the vehicle.  Agent Gonzales took custody of the two bundles of suspected methamphetamine and the three cellular phones.  Agent Gonzalez and transported them to the Newton Azrak USBP Station for processing.

17.   At the Newton Azrak USBP Station, Agent Gonzalez conducted an inventory of the Chrysler 300 and found a fourth

cellular phone (SUBJECT DEVICE 4) and a small plastic bag of what appeared to be black tar heroin located inside the glove box compartment.  Agent Gonzalez took custody of the cellular phone and the suspected heroin for further processing.

18.  At the Newton Azrak USBP Station, Agents J. Gonzalez and P. Castillo tested the two bundles inside the black trash bags utilizing a TruNarc handheld analyzer.  Both bundles tested positive for the characteristic of methamphetamine and had a combined gross weight of approximately 10.45 kilograms.  The substance found inside the glove box was tested utilizing a NARK II field test kit.  The substance tested positive for the characteristics of heroin and weighed approximately 96.62 grams.

19.  On April 2, 2020, at approximately 3:46 A.M, Agent Gonzales and Agent Castillo read Pedro ROJAS-SANCHEZ his *Miranda* rights from DHS form I-214.  ROJAS-SANCHEZ stated that he moved from Denver, Colorado to San Diego, California.  ROJAS-SANCHEZ stated that he purchased the Chrysler 300 from an individual in San Diego for $3,900 a couple of hours before he was encountered at the checkpoint.

20.  A DHS records check confirmed that ROJAS-SANCHEZ had five prior encounters with immigration and was removed from the United States in September 2017.

### V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

21.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

22.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

23.   Drug traffickers regularly use couriers and cars to import controlled substances into the United States.  These couriers sometimes work in teams, with one courier driving the vehicle and a second courier who communicates with the stash house operator to deliver the narcotics.

24.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

25.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it

is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

26.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

27.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

28.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

29.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to

diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

30.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[1]  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

31. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

d.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

e.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

f.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GIL-CARRANZA or ROJAS-SANCHEZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of GIL-CARRANZA or ROJAS-SANCHEZ's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

32.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. **CONCLUSION**

33.   For all of the reasons described above, there is probable cause to believe that Kevin GIL-CARRANZA and Pedro ROJAS-SANCHEZ have committed a violation of 21 U.S.C. § 846: Conspiracy to Possess with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii).  I also believe that there is probable cause to believe that evidence of violations of the Subject Offenses, as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT DEVICES, as further described above and in Attachment A of this affidavit.

/s/ signed pursuant to
Fed. R. Crim. P. 4.1

Ubaldo Perez, Border Patrol
Agent-Intelligence
United States Border Patrol

Subscribed to and sworn before me
this _3rd_ day of April, 2020.

HONORABLE KENLY KIYA KATO
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices, that is, the four cellular phones, seized on the evening of April 1, 2020 and early morning hours of April 2, 2020, currently maintained in custody of the United States Border Patrol in Murrieta, California:

1. Samsung Galaxy J7 Crown; Serial Number: R58K911WL5P;

2. Samsung Galaxy A10E; Serial Number: RF8N307PK5N;

3. Samsung Galaxy A10E; Serial Number: RZ8N2213KSJ; and

4. LG Phoenix 4; Serial Number: 910VTVR685175.

i

## ATTACHMENT B

### I.  ITEMS TO BE SEIZED

1.    The items to be seized are evidence of violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Methamphetamine), 21 U.S.C. § 846 (Conspiracy to Distribute Methamphetamine and Possess Methamphetamine with Intent to Distribute), and 18 U.S. Code 758 (High Speed Flight from an Immigration Checkpoint) (the "Subject Offenses"), namely:

a.    Records of text messages, Short Message Service ("SMS"), Multi-Media Messaging Service ("MMS"), and any other text or messages sent or received through web-based messaging applications, such as WhatsApp, FaceBook Messenger, Signal, GroupMe, KIK, etc., sent or received from the SUBJECT DEVICE concerning controlled substances and/or money, assets or payment between February 2, 2020 to present.

b.    Records of email communications sent or received from the SUBJECT DEVICE concerning controlled substances and/or money, assets or payment between February 2, 2020 to the present.

c.    Records of Global Positioning System ("GPS") coordinates and other information or records identifying location information of the SUBJECT DEVICE or files on the SUBJECT DEVICE to include information containing travel routes, destinations, origination points, and other locations, between February 2, 2020 to present.

d.    Photographs or videos of individuals, documents and other records, places, and things concerning controlled

ii

substances and/or money, payments, assets, or other forms of financial information.

e.   Address book and other contact information, including stored and saved names, addresses, telephone numbers, email addresses, I.P addresses, and websites associated with controlled substances, money, assets and/or transfers of funds.

f.   Call log information, including all telephone numbers dialed from the SUBJECT DEVICES, as well as all received/incoming or missed calls, from February 2, 2020 to present.

g.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

h.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

iv

## II. <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

3.     In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

4.     Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

5.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

6.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

7.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

8.   The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

9.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

10.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

11.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

12.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

13.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

14.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

15.  In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.  Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.  Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.  Any magnetic, electronic, or optical storage device capable of storing digital data;

d.  Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

16.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

17.   During the execution of this search warrant, law enforcement is permitted to: (1) depress GIL-CARRANZA or ROJAS-SANCHEZ's thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of GIL-CARRANZA or ROJAS-SANCHEZ's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a

person's thumb or finger onto a device and in holding a device
in front of a person's face, law enforcement may not use
excessive force, as defined in Graham v. Connor, 490 U.S. 386
(1989); specifically, law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

18.  The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.